OSCAR F. KINNEY and PERCY E. WOODWARD, Respondents, *v.* MASSACHUSETTS BONDING AND INSURANCE COMPANY and Another, Appellants.

Third Department, September 12, 1924.

Contracts — building contract — action against building contractor and bonding company to recover damages for breach of contract — evidence shows that contractor abandoned contract — contractor was not entitled to extra compensation — contractor was not delayed by steel contractor in performing contract — contractor was guilty of breach when it abandoned contract — damages properly allowed against both parties for money paid architects under new contract and for legal services in connection with default — damages against contractor properly allowed for amount paid for bond of new contractor and for bonds to procure discharge of mechanic's lien — bonding company not chargeable with said sums under terms of its bond.

In an action against a building contractor and a bonding company to recover damages for the alleged breach of the contract by the contractor, the evidence shows that the contractor abandoned the contract without justification and that its alleged claim for extra compensation made prior to the abandoning of the contract was without foundation since the contract expressly required it to do the things for which it claimed the right to extra compensation, and furthermore, abandonment of the contract was not justified on the ground that the steel contractor, who was engaged to erect the superstructure, delayed the contractor unreasonably and unnecessarily, since it distinctly appears that the steel contractor commenced its work just as soon as the contractor had the foundation in shape, and, therefore, the contractor was guilty of a breach of contract when it deserted the job.

The court properly allowed as items of damage against both the contractor and the bonding company sums paid to architects in the matter of superintending the work of the new contractor engaged to complete the building and also sums paid for legal services in the matter of the contractor's default.

The court properly allowed as against the contractor a sum paid by the plaintiff to procure a bond for the faithful performance of the contract made with the new contractor and a sum paid by the plaintiff to procure bonds for the discharge of mechanics' liens filed in the matter of claims against the contractor.

But it was error for the court to allow the last two items of damage against the bonding company since the bond in part provided that the bonding company would not be liable for the furnishing of any bond or obligation other than the instrument then executed.

APPEAL by the defendants, Massachusetts Bonding and Insurance Company and another, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Albany on the 19th day of June, 1919, upon the decision of the court rendered after a trial at the Albany Trial Term, a jury having been waived.

*Joseph A. Murphy,* for the appellant Massachusetts Bonding and Insurance Company.

*Robert B. Knowles,* for the appellant **W.** Shelton Swallow Company.

*Neile F. Towner,* for the respondents.

H. T. Kellogg, J.:

The plaintiffs were the owners of premises in the city of Albany lying between State street on the north and Norton street on the south. A brick building, which once stood upon the premises, had been razed to the first floor, but foundation walls and a concrete basement floor remained in place. The plaintiffs determined to erect upon the premises a nine-story building of modern type. It was a necessary preliminary to remove the old foundations and the basement floor, to shore up the walls of the adjoining buildings and underpin them. General excavations to a new building level were also necessary. On the 3d day of November, 1915, the plaintiffs entered into a contract with the defendant, the W. Shelton Swallow Company, relating to the construction of the new building. The Swallow Company, for a unit price, agreed to do all shoring and underpinning, and to excavate therefor. It also agreed, for the lump sum price of $77,000, to perform all masonry, carpentry, roofing, sheet metal, painting and glazing work, specified in plans and specifications attached, to make general excavations and to furnish all specified building materials to be used in the work contracted for. It agreed fully to perform on or before April 15, 1916. The plaintiffs made a separate contract for the erection of structural steel, specified for the new building, with the Levering and Garrigues Company. This contract was dated October 14, 1915. It provided that delivery and installation of steel grillage should begin on or before December 9, 1915; that superstructural steel should begin to be delivered on December 23, 1915; that the steel work should be substantially completed on February 3, 1916. The Swallow Company began work upon its contract on November 4, 1915, and continued to work thereunder until about February 14, 1916. On or about this date it discontinued all work and thereafter performed none. The plaintiffs brought this action, and have had a recovery, against the Swallow Company and the Massachusetts Bonding and Insurance Company, its surety, for damages resulting from the failure of the Swallow Company to complete its contract.

The premises upon which the new building was to be constructed were 168 feet in depth and 36 feet in width. This narrow space was bounded on either side by the high walls of adjoining buildings and on either end by public streets. It was necessary for the Swallow Company to start excavations paralleling the walls in

order that the earth beneath them might be removed and the spaces filled with concrete underpinning. It was then necessary to begin digging trenches alongside the walls and to pave the trenches with cement in order to receive longitudinal grillage which the steel contractors were required to place. After this grillage, consisting of steel girders, had been placed by the steel contractor and filled with concrete by the Swallow Company, it was necessary that cross trenches should be excavated and paved to receive cross grillage at intervals of about fifteen feet. The ends of the cross grillage beams were to rest on the longitudinal grillage and to be incased with cement. The steel contractors were then to erect a steel superstructure upon the grillage work. The superstructure, when erected, was to be incased with masonry work, and the building was to be roofed by the Swallow Company. It is clear that performance of the masonry contract was dependent upon performance of the steel contract, and, conversely, that performance of the latter was dependent upon performance of the former. Neither party could perform its contract and perform it on time unless the other party made timely performance. Yet neither party had the power to compel or hasten performance by the other party. It is not to be supposed that either party contracted to accomplish that which might prove to be an impossibility. Therefore, from the necessities of the case, it must be inferred that the plaintiffs, in contracting with the Swallow Company, and with the Levering and Garrigues Company, promised to each contractor timely performance by the other contractor of all work the performance of which necessarily preceded the fulfillment of its own obligation.

The Swallow Company, prior to February 14, 1916, had been engaged in underpinning walls, excavating for longitudinal and cross grillage, filling trenches with concrete to receive grillage, concreting the grillage and making general excavations for the new basement floor level. On that day the Swallow Company wrote the plaintiffs a letter inclosing a bill for extra work and for damages arising from alleged delays on the part of the steel contractor. It asserted that, in excavating the basement floor of the old building, it encountered underneath the cement, down the center line of the floor, steel grillage which had been placed to support a line of supporting columns; that this grillage was concealed from view and its existence was unknown to it when the contract was made; that disclosure of its existence should have been made to it by the plaintiffs whose architects had themselves long previously caused the grillage to be placed; that it was entitled to extra compensation for the removal of the grillage. It also asserted that the plans and specifications did not indicate that the

Swallow Company was called upon to excavate or pave for cross grillage work, or to incase cross grillage with concrete. It also asserted that the steel contractors had unnecessarily delayed the steel work, causing delay and damage to the plaintiffs. The bill inclosed itemized various charges for delay and extra work aggregating $14,700. The letter said: " Under the circumstances we are unwilling to proceed with the work unless we can have from you a further allowance of time for completion, an agreement to pay our bill annexed hereto and a further agreement on your part to pay us all additional cost and expense arising out of or in connection with the present situation." It also said: " In the event of your failure to meet our demands, we will elect to consider the contract broken and hold you responsible for all damage." The plaintiffs replied with a letter of February 17, 1916, in which they stated that the Swallow Company's claims appeared to have no merit, and that unless that company proceeded with the work the plaintiffs would avail themselves of their contract rights. They requested the Swallow Company to advise them whether it would " continue your work under the contract." Several letters passed between the parties, but in none of them did the Swallow Company advise the plaintiffs that they would continue work. Finally, on February twenty-fourth, the plaintiffs served a written notice upon the Swallow Company and its defendant surety. This notice recited that the Swallow Company had refused and neglected to provide a sufficiency of materials and of workmen for the due progress of the work, that it was continuing in such refusal and neglect, and that it was causing " an unreasonable neglect and suspension " of the work. It gave notice that if the Swallow Company continued in such refusal and neglect for a period of forty-eight hours the plaintiffs would take possession and provide materials and labor to finish the job in the place of the Swallow Company. On February 25, 1916, the Swallow Company, having been served with the notice, wrote a letter to the plaintiffs in which, among other things, it said that " it is absolutely impossible to attempt to comply with your wishes to proceed with the work." It also said: " The conditions are practically identical with our notice of February 14th, and we reiterate that we are unable to proceed with our work, and we request, as per our notice of February 14th, an agreement to immediately adjust and pay our bills of damages and extras," etc. Thereafter, the notice not having been complied with, the plaintiffs took possession and let a contract for the completion of the work specified in the Swallow Company contract with resultant damage to themselves.

The defendants now contend that, when the notice was served,

there was no work which the Swallow Company could perform "advantageously or economically," and that the plaintiffs, therefore, "defaulted the Swallow Company" without right. The Swallow Company and the Levering and Garrigues Company, the steel contractors, had undertaken to perform their separate contracts upon premises the area of which was much restricted. If, in the course of the work, the Levering and Garrigues Company had so occupied the lot with men, materials and machinery as to render economical and advantageous work by the Swallow Company impossible, it would doubtless have been the privilege of the latter temporarily to suspend work. Its obligation was to complete upon a certain date. A suspension which did not imperil that result would not be unreasonable and would afford to the plaintiffs no just ground of complaint. However, it was not a condition similar to that assumed which influenced the Swallow Company to quit work. It did not propose merely to suspend. It proposed to abandon all work under the contract. The proof and the correspondence permit no doubt concerning its attitude and its intent. From the eighth to the fourteenth of February the Swallow Company did no work whatsoever. On the fourteenth, as already stated, it wrote the plaintiffs that unless the plaintiffs paid certain bills rendered therewith and made certain agreements it would "elect to consider the contract broken." Between the fourteenth and twenty-third of February the Swallow Company did no work except that on the sixteenth it was "cutting concrete for steel beams over front area" and on the twenty-third it was "cutting down concrete in front area to receive sidewall beams." On the twenty-fourth of February it received the plaintiffs' notice, and upon the twenty-fifth wrote the plaintiffs reiterating that as stated in its letter of February fourteenth "we are unable to proceed with our work." After February twenty-fourth it did no further work upon the contract. Thus the service of the plaintiffs' notice did not in the least alter the attitude of the Swallow Company or cause its failure to resume work. It had already made its election. Nothing is clearer than that the Swallow Company was not "defaulted," but voluntarily abandoned the contract. It remains to inquire whether the abandonment was justifiable.

We agree with the trial court that the Swallow Company was not entitled to extra compensation for removing the grillage underneath the floor of the old building. The contract expressly required that the Swallow Company remove "column footings." The grillage constituted "column footings" and the Swallow Company was sufficiently advised of its existence by the employment of the

19

phrase. We also agree with the trial court that the plans and specifications sufficiently indicated the obligation of the Swallow Company to excavate for the cross grillage and to do the concreting in connection therewith. We think that the Swallow Company was not entitled to extra compensation in this respect. The subject of delays by the steel contractors requires a more extended discussion.

Although the Levering and Garrigues Company contracted to begin the installation of steel grillage on December 9, 1915, it did not in fact begin until January 13, 1916. It completed the steel work within about eight weeks, or within about the period, after the commencement of work, which had been agreed upon. The chief delay on the part of the steel contractor, therefore, was in postponing the beginning of its installation from December ninth to January thirteenth. It is necessary to inquire whether this postponement was due to a failure on the part of the Swallow Company properly to advance necessary preparatory work or was exclusively the fault of the steel contractor. The diary of Edward W. Hyde, an employee and witness for the plaintiffs, the accuracy of whose observations is not disputed, shows the progress of the work from December 13, 1915, onward. In the matter of digging trenches for longitudinal grillage and paving the same the first work done by the Swallow Company was on the west side of the premises. Hyde states, under date of December thirteenth, as follows: " At 4:30 P. M. started concreting first of foundations under steel grillage on west side near center of building." This was five days after the steel contractor was required to begin installation. On December seventeenth Hyde says: " There is now enough concrete base in place to receive grillage steel for four columns on the west side; but it would be impossible for any steel men to get in to set it as there is still a lot of excavating to be done and all working space is in use by teams, laborers and concrete materials and equipment." The Swallow Company continued to concrete trench on west side until December twenty-first. On that date Hyde says: " There is now enough concrete base in for six columns on west side, but no place for steel people to work and no steel in town to go in as far as can be ascertained." It is immaterial that there was no steel in town if the laying of the steel was impossible. The Swallow Company continued excavating and paving on the west side. On December thirty-first Hyde says: " West side is ready for steel grillage for the full length except for small piece at north end not yet put in, at some points, trenches are excavated slightly narrow and at two points, i. e., southwest corner and at columns 8 and 9, concrete is too high and will have to be cut down before grillage can be set. Excavating still going on in such

a manner that steel could not be handled." On January third Hyde says: "Excavated underpinning on east side, also grillage trench on east side. Night gang followed with concrete." On January fourth he says: "Put in a good stretch of concrete grillage base and two underpinning piers." On January eighth he says: "Excavating and removing old grillage near State Street end." On January eleventh he says: "All bases for longitudinal grillage are now in and grillage steel expected. There is however still considerable excavation to be taken out. Also there is trimming up of trenches, cutting of concrete bases and underpinning projections to be done before steel can be properly set; also shoring along west side near front, along rear wall and along retaining wall at southeast corner will have to be shifted before steel work can go ahead very far." As late as January thirteenth the Swallow Company was "moving brick pile on State Street shoring front wall, excavating, cleaning off grillage beds, pumping water." This was the very date upon which the steel company began to set the grillage. Throughout the period from December thirteenth to January thirteenth the Swallow Company, in addition to digging trenches, was making general excavations, concreting and underpinning the building walls. When it is remembered that the new building was to cover the entire premises from street to street, that the premises were only thirty-six feet wide, lying between the walls of high buildings, that as high as fifty laborers a day employed by the Swallow Company were working in this space, that the space was also occupied with teams, a concrete mixer and machinery, it is surprising that the steel contractor found it possible to begin operations on the date when it did. The witness Reeve, an employee of the steel contractor, states the condition existing on January tenth. He says that on that date the ground level of the premises on the State street side was five feet above the contract level, while upon the Norton street side it was four feet. General excavations yet to be done by the Swallow Company involved the entire premises and required the performance of substantial labor by men and teams. The steel contractor was unable, because of excavation work yet to be done, to set up derricks to move its steel upon the premises. Heavy steel girders had to be drawn in by hand. Reeve says: "That the concrete footings that had already been placed were not in proper condition to take our grillage, inasmuch as they ranged from three and one-half inches high to six inches low." He states that prior to January tenth it was impossible to set any steel. After January thirteenth the Swallow Company was still engaged in excavating and pouring concrete, cleaning off grillage bases, building forms

and removing shoring. It was performing work of this character on January nineteenth. On that day Hyde says: " Steel men setting and lining grillage beams in rear, where they are delayed by shores and sheet piling being in the way." On January twenty-first the Swallow Company was engaged as follows: " Cutting down concrete where too high for steel grillage, digging for water main, moving brick pile, cleaning off grillage bases." It was then employing fifty-three men. On January twenty-fifth Hyde makes this significant statement: " Swallow Company requested that steel people stay out of cellar with derrick and cross grillage for a few days to give them a chance to remove the balance of the general excavation and excavate cross trenches for grillage, which they did until January 27th." If the work of the steel contractor upon this date interfered with work by the Swallow Company so that it could not be done " economically and advantageously," then conversely it was doubtless true that the work of the Swallow Company had interfered with the steel contractor so that its work could not be done to advantage. Indeed, it would appear from this statement that the steel contractor, instead of having delayed the commencement of its work, had begun the same prematurely. Again, if it be true, as argued by the appellants, that the Swallow Company during days when work could not be done " economically and advantageously " was not obliged to have men on the job, the argument has equal application to the steel contractor to absolve it from any obligation to begin work prior to January thirteenth, and indeed to make its action in beginning then wholly unnecessary. The Swallow Company began excavating for cross grillage on January twenty-sixth and continued with the work until January thirty-first. On February first and thereafter the steel contractor was setting cross grillage. On February seventh Hyde says: " Steel men setting cross grillage, but are delayed by Swallow Company having to cut away parts of underpinning." The Swallow Company stopped work on the night of February seventh. From this proof and other evidence in the case, the conclusion inevitably follows that the steel contractor was delayed by the Swallow Company rather than that the Swallow Company was delayed by the steel contractor. It may well be that the Swallow Company prosecuted the work with diligence and employed all the labor which economically could be used. It may be that there were delays encountered which would have entitled it to an extension of time for the completion of its contract. It is manifest, however, that it was not delayed by the steel contractor or, if delayed in the least, that the delays were insignificant and wholly insufficient to justify the Swallow Company in abandoning its contract. We

hold, therefore, that the Swallow Company was guilty of a breach of contract when it deserted the job and became liable for all damages naturally ensuing to the plaintiffs.

The principal item of damages which the plaintiffs were allowed to recover was a sum determined by the difference between the lump sum at which A. Pasquini, to whom the plaintiffs let a contract to finish the job, agreed to complete, and the sum still unpaid to the Swallow Company upon its contract when it abandoned the work. With the allowance of this sum the defendants, except that they dispute any liability, have no quarrel. The plaintiffs also were allowed to recover sums paid to architects in the matter of superintending the Pasquini work, and sums paid for legal services in the matter of the Swallow Company default. The performance of these services was directly occasioned and made necessary by the default of the Swallow Company. We think an allowance therefor was proper. The plaintiffs were also allowed to recover a sum paid by them to procure a bond for the faithful performance of the Pasquini contract and a sum also paid by them to procure bonds for the discharge of mechanics' liens filed in the matter of claims against the Swallow Company. We think that the payment of these sums was a necessary consequence of the Swallow Company default. In order to complete their building it was necessary for the plaintiffs to procure the discharge of the liens by the giving of bonds. While we think that the payments thus made necessarily resulted from the default, we hold that the defendant, the Massachusetts Bonding and Insurance Company, because of the terms of the policy issued by it, was not liable to reimburse the plaintiffs therefor. The bond in part provides that the obligor shall not be liable " for the furnishing of any bond or obligation other than this instrument." The words are unambiguous and have force to relieve the defendant named from liability for the payments in question.

As to the defendant W. Shelton Swallow Company the judgment should be affirmed; as to the defendant Massachusetts Bonding and Insurance Company the judgment should be modified by deducting from the recovery the two items of payments made by the plaintiffs for the procurement of bonds, and as modified affirmed, with costs against both defendants.

As to the defendant W. Shelton Swallow Company the judgment is unanimously affirmed; as to the defendant Massachusetts Bonding and Insurance Company the judgment is modified by deducting from the recovery the two items of payments made by the plaintiffs for the procurement of bonds, and as modified unanimously affirmed,

with costs against both defendants. The court disapproves of finding of fact No. 12, made at the request of the defendant W. Shelton Swallow Company, and finding of fact No. 20, made at the request of the defendant Massachusetts Bonding and Insurance Company.